**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Cases Nos.** |
| **EMPIRE ONE TELECOMMUNICATIONS, INC., et al.,** | : | **01-11894, 01-11896 - 01- 11898** |
| **Debtors.** | : | **(Jointly Administered)** |

# AFFIDAVIT OF FRANK C. SZABO IN SUPPORT OF FIRST DAY MOTIONS

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

FRANK C. SZABO, being duly sworn, deposes and says,

1. I am the Chief Financial Officer and acting Chief Operating Officer of Empire One Telecommunications, Inc., Sonus Communications, Inc., EOT Telecommunications of Canada, Inc. and Empire One Power, Inc. (collectively, the "Debtors"), debtors and debtors in possession herein. I have personal knowledge of, and am familiar with, the business affairs of the Debtors. With respect to financial information set forth herein, I have relied on information provided by various officers of the Debtors, and with respect to pending legal matters, I have relied on the Debtors ' attorneys.

2. I submit this affidavit in support of the first day motions filed by the Debtors in the above-captioned cases.

## Background

3. On April 2, 2001 (the "Petition Date"), the Debtors commenced cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue

to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

5. The Debtors provide a diverse range of wholesale and retail integrated communications services, including standard voice telecommunications (local and long distance), dial-up and dedicated Inernet access and specialized data services for commercial subscribers. The Debtors maintain Web portals in Chinese, Russian and English,. and their marketing, sales and customer services are provided in the languages of their target markets.

6. The filing of the Debtors' chapter 11 petitions was precipitated by a number of factors. The voice and data service technology employed by the Debtors, known as "Voice Over IP," did not command the degree of customer acceptance and demand as contemplated. This factor, coupled with increased competition and service outages, negatively impacted price of the service. In addition, the Debtors entered into agreements with several service providers at uneconomic terms, which has resulted in significant operating losses. The Debtors have had to absorb substantial write-downs of network equipment upon discontinuing service with these providers. The Debtors have been further burdened by considerable existing debt and the inability to obtain additional financing going forward.

**The Debtors' Motion to Maintain Their Existing Bank Accounts and Cash Management System**

7. Prior to the Petition Date, and in the ordinary course of their business, the Debtors maintained bank accounts (the "Bank Accounts") with the banks (the "Banks") listed on Exhibit A to the Debtors' Motion for Authorization to Maintain Their Existing (1) Bank Accounts and Business Forms and (2) Cash Management System (the "Bank Account Motion").

The Debtors routinely deposit and withdraw funds from the Bank Accounts by check, wire transfers and automated clearinghouse transfers.

8. The Bank Account Motion seeks, inter alia, an order of the Court authorizing the Debtors to maintain their existing bank accounts and business forms and directing the Banks to honor all pre-petition checks paid by the Debtors to which stop payment orders have not been issued prior to the Petition Date. The relief requested is critical to the Debtors to avoid substantial disruption of their business and financial affairs and because most of the checks that the Debtors seek to have honored represent payments made (a) to or for the benefit of employees on March 30, 2001 in connection with the Debtors' March 30, 2001 payroll (for wages and benefits payable through March 30, 2001), (b) commissions paid to the Debtors' sales agents and employees and (c) payments to certain taxing authorities in connection with sales, excise and other taxes remitted to federal and state agencies, in addition to payments made in connection with annual income and/or corporate business taxes, including payments accompanying extensions for filing tax returns. Any dishonor of these checks could result in serious consequences to the Debtors' business, including employee morale problems.

9. The Bank Account Motion also seeks authority for the Debtors to continue using their existing cash management system. The Debtors use The Commercial Bank of New York and North Fork Bank as their primary cash management banks, through which most of their trade collections are deposited and disbursements are made. The cash management system is consolidated through the accounts of Empire One Telecommunications, Inc. ("Empire One") and operates as follows:

(1) Cash needs are fulfilled from cash generated from the Debtors' business operations.

(2) Empire One maintains a concentration account for the collection of funds and separate accounts for expenditure of funds. On its own

behalf and on behalf of the other Debtors, Empire One collects funds from the sale of telecommunications services and deposits such funds into a bank lockbox account. Funds are paid from two different accounts: (1) operating, from which all operations expenses, including taxis, are paid; and (2) Payroll, from which all payroll related expenses are paid.

10. The cash management procedures of the Debtors have been utilized, as described above, since 1999 and constitute ordinary course, essential business practices for the Debtors' operations. The cash management system provides significant benefits, including, inter alia, the ability to (i) control collections and disbursements by the operating entity, (ii) invest idle cash efficiently, (iii) ensure maximum availability of funds when necessary and, (iv) maximize interest earned on funds. Substantial effort has been expended by the Debtors to provide cash management systems that allow the Debtors to optimally manage their business. The Debtors believe that the maintenance of their cash management system is in the best interests of the Debtors, their creditors and all other parties in interest.

11. The Debtors shall, as they did prior to the Petition Date, maintain records of all transfers made within the cash management system so that all transfers and transactions are adequately and properly documented in, and ascertainable from, their books and records.

**The Debtors' Motion to Pay Prepetition**
**Sales, Use, Franchise and Gross Receipts Taxes**

12. In connection with the normal operation of their business, the Debtors collect and/or pay sales, use, franchise and gross receipts taxes on behalf of various state, local and federal taxing authorities (the "Taxing Authorities") including but not limited to:

- Sales Tax: The Debtors collect and remit sales taxes in connection with sales through agents, sales made directly to consumers, sales made directly to employees and other sales where conditions require such sales tax to be charged. The Debtors also pay sales tax relating to certain equipment, business supplies and services where the seller (including affiliate sellers)

of such equipment, business supplies and services is obligated to charge such tax.

- Use Tax: The Debtors pay use taxes on the privilege of ownership, possession, use, storage or consumption of tangible personal property, such as equipment, business supplies and services where the seller (including affiliate sellers) of such equipment, business supplies and services is not obligated under the applicable state law to charge sales tax to the Debtors.

- Franchise Tax: The Debtors remit franchise taxes for the privilege of doing business in certain states. Such tax is imposed upon a tax base that may include total capital (as adjusted under state law), total assets and/or net income. Such tax base is typically apportioned based upon the Debtors' activities within a state.

- Gross Receipts Tax: The Debtors remit gross receipts taxes for the privilege of doing business in certain states. The tax is generally calculated based on gross receipts within the tax jurisdiction.

- Excise Tax: The Debtors pay a telecommunications excise tax imposed by Section 4251 of the Internal Revenue Code, 26 U.S. Code et seq.

13. The Debtors pay to the Taxing Authorities all sales, use, franchise, gross receipts and excise taxes collected, on a periodic basis, typically monthly or quarterly, on the 5th 10th, 15th or 20th of the month, by checks drawn on the Debtors' main disbursing checking account at North Fork Bank.

14. As of the Petition Date, the Debtors have approximately $185,000 in accrued but unpaid sales, use, franchise gross receipts and excise taxes. Further, certain Taxing Authorities were sent checks for prepetition obligations that may or may not have cleared the Bank Account as of the Petition Date. Dishonor of these checks and an inability to pay the Taxing Authorities could result in significant harm to the Debtors. Accordingly, the Debtors believe that Court approval of an order authorizing these payments is appropriate.

**The Debtors' Motion to Pay Prepetition Employee Wages and Benefits**

15. Prior to the Commencement Date and in the ordinary course of their business, the Debtors paid their 54 employees (the "Employees") on a semimonthly basis, on the 15th and last business day of the month (the "Payment Date"), for the preceding one-half month period ending on the Payment Date. The Debtors' aggregate average payroll is approximately $80,000 per semi-monthly pay period .

16. The Debtors believe that there are no pre-petition wage payments currently due and owing to Employees other than commissions to internal sales people in the amount of approximately $15,000. Moreover, the Debtors believe that the amounts they are required by law to withhold from employee payroll checks for federal, state and local income taxes, including unemployment contributions and taxes, and social security and medicare taxes, and amounts that the Debtors are required to directly pay for state unemployment taxes and contributions and workers compensation programs on behalf of employees, (collectively, together with wages, the "Compensation Obligations") have been paid. The Debtors nevertheless recognize that it is possible that certain Employees may not in fact have been paid.

17. Moreover, in the event that a portion of the payroll beginning on April 2, 2001 (the Petition Date) may be deemed to be pre-petition wages and benefits, to the extent such wages and benefits were earned prior to the actual filing of the chapter 11 petitions, the Debtors wish to ensure that such wages and benefits will be paid. Finally, the Debtors wish to ensure that the commissions to sales people are paid. If such payments are not made, the ensuing morale problems would severely hurt the Debtors' business.

18. The Debtors employ various employee benefit plans and policies for the benefit of their employees, which include medical and health insurance, vacation pay, travel

expense and housing reimbursements, sick time, salary continuation/short and long-term disability, holiday pay, leave of absence, 401(k) plan and other similar such benefits (collectively, the "Employee Benefits"). Benefits such as charitable donations, wage garnishments and other employee deductions are exclusively deducted from employees' wages.

19. The Debtors estimate that, as of the Petition Date, their unpaid obligations for the Employee Benefits aggregate approximately $9,100, which amount comprises the following: (i) matching payments for the Debtors' 401(k) plan aggregating approximately $3,600; and (ii) certain accrued and unpaid obligations for Employee Benefits aggregating approximately $5,500.

20. As a result of the commencement of the Debtors' chapter 11 cases, and in the absence of an order of the Court providing otherwise, the checks, wire transfers and direct deposit transfers in respect of the prepetition Compensation Obligations and Employee Benefits (collectively, the "Prepetition Employee Obligations") may not be paid. Accordingly, the Debtors seek authority (i) to pay the Prepetition Employee Obligations that become due and owing during the pendency of these cases and (ii) to continue their practices, programs and policies with respect to the Prepetition Employee Obligations, as such practices, programs and policies were in effect as of the Petition Date, including allowing employees to use accrued vacation time as of the Petition Date.

21. The Debtors believe that the entry of an order authorizing them to pay the Prepetition Employee Obligations and to continue their practices and, programs and policies with respect to the Prepetition Employee Obligations is necessary to avoid substantial morale problems.

**The Debtors' Motion for Authorization to Provide Adequate Assurance to Utility Companies**

22. In connection with the operation of their businesses and management of their properties, the Debtors obtain telephone, transmission and similar services (together, the "Utility Services") from one or more utility companies (the "Utility Companies")

23. If the Utility Companies are permitted to terminate Utility Services after the Petition Date, the Debtors will be forced to cease operation of their facilities, resulting in a substantial loss of sales and profits and the Debtors' businesses will be irreparably harmed. To avert the loss of business, the Debtors would be required to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of necessary Utility Services and, ultimately, the demise of their businesses.

24. Accordingly, the Debtors seek an order (a) prohibiting the Utility Companies from altering, refusing or discontinuing services on account of prepetition invoices, (b) providing that the Utility Companies have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, without the need for payment of additional deposits or security, (c) providing that if a Utility Company objects within twenty-five (25) days after entry of the order granting the Motion and requests additional adequate assurance that the Debtors believe is unreasonable, the Debtors will file a Motion for Determination of Adequate Assurance of Payment (the "Determination Motion") and set such motion for a hearing (the "Determination Hearing") and (d) providing that, in the event that a Determination Motion is filed or a Determination Hearing is scheduled, any objecting Utility Company shall be deemed to have adequate assurance of payment under section 366 of the Bankruptcy Code without the need

for payment of additional deposits or other securities until an order of the Court is entered in connection with such Determination Motion or Determination Hearing.

25. To the best of the Debtors' knowledge, there are no significant defaults with respect to undisputed Utility Service invoices, other than payment interruptions that may be caused by the preparation for and commencement of these chapter 11 cases. In addition, the Debtors represent that they will continue to pay all postpetition obligations, including utility bills, as billed and when due. The adequate assurance proposed herein, which includes explicitly granting administrative expense priority to any postpetition utility obligations, will provide more than sufficient protection to the Utility Companies.

26. The Debtors submit that adequate assurance of payment to the Utility Companies is evident in their chapter 11 cases. As of the commencement date, the Debtors had an accounts receivable balance on collectible accounts of $1,500,000, which indicates that the Debtors will have more than sufficient availability of funds with which to pay all postpetition utility charges and other administrative expenses.

DATED: April 2, 2001

s/ Frank C. Szabo
FRANK C. SZABO

Sworn to before me this
2nd day of April, 2001

s/ Rosemary Scariati
Notary Public

NYC 374136